437 So.2d 816 (1983)
Robert G. CREELY
v.
LEISURE LIVING, INC. and Jesse Martin Realty Mart, Inc.
No. 83-C-0358.
Supreme Court of Louisiana.
September 2, 1983.
*817 Paul M. Lapeyre, Kenner, for applicant.
Jesse S. Guillot, New Orleans, Robert G. Creely, Gretna, for respondents.
CALOGERO, Justice.
The Court of Appeal denied to a real estate agent a fee, or a commission, in connection with the sale of a house after the district court had awarded $1,500 on quantum merit. We granted writs upon application of the realtor. 430 So.2d 80 (La.1983). Upon review however, we affirm the Court of Appeal judgment.
The attorney-notary who passed the sale, one Robert Creely, initiated this concursus proceeding to determine the rightful claimant to $2,205 (which represents three percent of the sales price of the house), as between the builder/seller Leisure Living, Inc. and the real estate broker Jesse Martin Realty Mart, Inc. After trial on the merits, the district court found that, while no contract existed for the payment of the commission, the realtor was entitled to $1500 in quantum meruit for services rendered. On appeal, the Court of Appeal reversed, finding neither a contractual obligation nor any equitable or other applicable legal reason to support recovery by the realtor. 423 So.2d 1224 (La.App. 5th Cir.1982).
The events which preceded this litigation are as follow:
On July 24, 1979, the builder, Leisure Living Inc., entered into a six month listing agreement with Jesse Martin Realty Mart Inc. pursuant to which the realtor was to attempt to sell five houses which were to be built to specification on Carthage Street in Nottingham subdivision on the west bank of Jefferson Parish. To that end, the realtor was permitted by the builder to have a sign on a corner lot and a temporary sales office on the property. Commission was paid on the five houses built and sold under that listing agreement. No listing agreement was ever entered concerning any additional house or houses, in particular the house discussed in the succeeding paragraphs.
Alfred Gaudet, the buyer in this case, was attracted by the construction underway at the Nottingham subdivision. He and his family visited the site, then talked, initially and several times, to Ronald Bermudez and Gary Ritter, partners in Leisure Living, Inc. During these visits, they were becoming more and more sure of their interest in buying a particular model home. Also, Mr. Gaudet discovered that he used to work with Ritter's father and was acquainted, as well, with the father of Bermudez. As events would have it happen, the particular model in which the Gaudets were most interested had been sold already. Bermudez and Ritter, however, were willing to build another home to the Gaudets' specifications on another lot in the same west bank subdivision. For the purpose of concluding the details incident to an agreement to purchase, Ronald Bermudez accompanied Alfred Gaudet to the realtor's on-site office and introduced him to Delores Thompson, agent with Jesse Martin Realty Mart, Inc.
On October 24, 1979, an agreement to purchase a home to be constructed in Nottingham Subdivision was signed by Ronald Bermudez on behalf of Leisure Living, Inc. and by Mr. and Mrs. Alfred Gaudet, Jr. The contract, bearing the Jesse Martin Realty Mart letterhead, included the condition that financing for the $48,500.00 balance on *818 the selling price of $73,500.00 be obtained within seventy-five days of the contract's acceptance. (There was a cash down payment of $25,000.00.) Should the loan application not be accepted by the deadline, January 8, 1980, the agreement to purchase would be null and void and the agent would then be authorized to return the purchaser's deposit in full. It was also specified in the agreement to purchase that the sale of the new Nottingham house was "predicated on sale of purchaser's home located [at] 763 Avenue G, Westwego, listed for sale with Jesse Martin Realty Mart." The realtor thereupon undertook to find a buyer for the Gaudet home, did so, and in fact earned a commission, when the act of sale on the Westwego property was passed in March, 1980.
After the signing of the October 24, 1979, agreement to purchase, the agent, Delores Thompson, advised the Gaudets on how to go about obtaining the loan, and Gaudet duly applied to Carruth Mortgage Corporation for the stipulated thirty year mortgage loan at a rate of interest not to exceed eleven percent. Loan approval was not obtained by the stipulated deadline, January 8, 1980, through no fault of either party to the contract. On that date, the agreement to purchase was no longer enforceable.
A buyer for the Gaudets' Westwego residence had been obtained by Jesse Martin Realty Mart, Inc. in November of 1979, with the act of sale to take place on or before March 15, 1980. When it became evident that the Gaudets' loan approval (on the Nottingham house) was not going to be forthcoming by January 8, 1980, and that their new house was not going to be finished by January 30, 1980, the date before which the act of sale was to be passed under the October, 1979, agreement, the builder agreed to extend the date for passing the act of sale to March 15, 1980. Ms. Thompson approached Alfred Gaudet with the proposed extension, but also with the expressed opinion that the house would not be completed by the mid-March deadline.[1] Various alternatives to purchasing that house from Leisure Living, Inc. were discussed.[2] The Gaudets requested time to think over their housing dilemma, during which time Ms. Thompson showed them other already-constructed housing in the vicinity, that might meet their needs. Mr. Gaudet refused to sign the extension of the October, 1979, purchase agreement. A release from the October, 1979, purchase agreement was prepared after Gaudet told the agent that he had decided instead to buy a condominium on the east bank directly through a builder.
What indeed had happened at this point, apparently, was that Alfred Gaudet had become disenchanted with the broker and concerned over the broker's loyalty to Leisure Living. He reported to Ronald Bermudez that he was being shown other houses by Ms. Thompson whom Gaudet had believed to be the exclusive broker for Leisure Living, Inc. Ronald Bermudez testified at trial that when he asked Jesse Martin about the matter, Mr. Martin first appeared not to know of the situation, but then stated that the realty firm had the right to show other houses to the Gaudets since its duty was to protect the purchaser. This response did not sit well with Bermudez.
While these skirmishes were taking place between the realtor, the buyer, and the builder in late January of 1980, Carruth Mortgage forwarded the documents incident to the Gaudets' loan application to attorney Robert Creely for finalization. In the course of inspecting the papers, Creely discovered the lapsed purchase agreement. The loan could not be finalized with an *819 expired sale-purchase agreement. From Creely's office, Mr. Gaudet called Jesse Martin Realty Mart about the release for the now invalid October agreement and received verbal assurances that it had indeed been prepared. A copy of a release dated and signed by Gary Ritter (for Leisure Living) on February 2, 1980, and by Alfred P. Gaudet, Jr. on February 4, 1980, was entered into evidence at trial. Likewise Delores Thompson testified that on February 4, 1980, she returned to Alfred Gaudet, Jr. his $1,000 deposit on the Nottingham house. At the time of executing the release, Ms. Thompson apparently still thought that the Gaudets were buying property on the east bank. She testified that it was only on March 12, 1980, that the Gaudets told her they were buying the property from Leisure Living, Inc. after all.
The buyer, Gaudet, and the seller, Leisure Living Inc. as represented by Ronald Bermudez, drew up and signed a new purchase agreement dated February 1, 1980, to accompany the pending loan application. That agreement provided that the act of sale was to take place on or before March 15, 1980, and did not provide for the seller's paying any realtor's commission. On February 11, 1980, Gaudet received his loan approval from Carruth Mortgage Company. The house was apparently completed as contemplated by the February agreement to purchase. On March 14, 1980, the act of sale on Gaudet's former residence took place. On March 18, 1980, the act of sale of the Gaudets' new house in Nottingham subdivision was passed before Creely. At the time of the sale, Creely anticipated that Jesse Martin Realty might claim a commission and so he withheld $2,205 from the proceeds of the sale and instituted this concursus proceeding.
The question presented here is whether the broker (agent) earned a fee under the outset contract, under some sort of extension of the listing agreement for the original five houses, or for being the procuring cause of the sale or under some form of equity, such as to prevent the unjust enrichment of the seller (principal).
A realtor is entitled to a commission when he is a third party beneficiary to a valid contract between a seller and a buyer. Eanes v. McKnight, 262 La. 915, 265 So.2d 220 (1972); Grace Realty Co. v. Peytavin Planting Co., 156 La. 93, 100 So. 62 (1924); Sleet v. Gray, 351 So.2d 286 (La. App. 3rd Cir.1977). Jesse Martin Realty Mart, however, is not such a realtor in this instance. The outset agreement to purchase had expired by its own terms and was null and void when the buyer did not obtain an eleven percent thirty year mortgage loan by January 8, 1980. "The explicit terms of the agreement rendered it null and void ... and an offer thereafter to finance could not breathe life back into the document." Timmerman v. Smith, 413 So.2d 627 at 632 (La.App. 1st Cir.1982). Nor do we find that there was any express or implied extension of the original contract beyond the January expiration date, under which the broker might be entitled to recover a commission from the builder.
This situation is distinctly different from one where, pursuant to a listing agreement, the agent independently solicits buyers on behalf of a seller and eventually finds a willing buyer. Carter v. Hayes, 337 So.2d 295 (La.App. 2d Cir.1976), writ refused, 339 So.2d 854 (La.1976); Gaspard v. Siggio, 313 So.2d 380 (La.App. 3rd Cir.), writ refused, 318 So.2d 41 (La.1975). In this case, an existing business relationship between the builder and the broker concerning the sale of five other houses and the broker's maintaining a temporary sales office on the premises, prompted Ronald Bermudez of Leisure Living, the builder, to introduce this prospective buyer to the agent. The purpose of that introduction was for the agent to assist in concluding the sale arrangements. Incident to the prospective purchase agreement, the builder was willing to allow the broker to collect a commission on the sale of this house even though there was no obligation on the part of the builder to allow the broker concerning this house to assist in the sale and/or earn a commission. This harmonious relationship continued, possibly through mid-January, *820 including, and through, the time when the agent (realizing that the house would not be completed by the deadline under the October contract) suggested and obtained from the builder an offer to extend the time for passing the act of sale to mid-March, 1980. Shortly thereafter, however, the builder became aware of the broker's infidelity, as he perceived it, i.e. Ms. Thompson's showing the Gaudets alternative housing and Jesse Martin's assertion that his duty was to the purchaser. Gaudet testified at trial that he noticed some change in the relationship between the builder and the broker during the week ending on January nineteenth, two weeks before the proposed act of sale under the original contract and after the time for obtaining the loan had expired. It was during this same period of time that Ms. Thompson approached Gaudet about looking at some other houses.
The agreement on the part of the builder to extend the time during which the act of sale was to be passed is similar to the original contract in that it represents an expressed willingness on the part of the builder, in keeping with a professional cordiality and perhaps, indirect self-interest, to pay the agent a commission on the sale of the builder's house, based upon no listing agreement or other legal compulsion. This willingness on the part of the builder changed dramatically upon his becoming aware of the broker's "infidelity."
We can infer from the testimony of Gaudet, Bermudez, and Ritter, that by mid-January, 1980, the formerly good business relationship which had existed between the builder and the broker began to sour. The apparent and now-litigated result of this change of heart was that Gaudet refused to sign the proposed extension of the October 24, 1979, agreement to purchase, which effectively ended his relationship with the broker on any sale of the Nottingham house. Since the builder's unilateral offer to extend the written contract had not been accepted by the buyer, the builder's contractual relationship with the agent had likewise come to an end. The written contract to buy and sell, for all effects and purposes, was dead. Thereafter, Leisure Living and the Gaudets came to an agreement for the sale of the house between themselves without intending, nor providing, that any commission be paid to the agency. Accordingly there is no contractual theory by which Jesse Martin Realty can recover a commission under the October 24, 1979, contract nor under any implied extension of that contract. Williams v. Bel, 339 So.2d 748 (La.1976); Guy L. Deano, Inc. v. Michel, 191 La. 233, 185 So. 9 (1938); Boisseau v. Vallon and Jordano, 174 La. 492, 141 So. 38 (1932).
Furthermore, while in some cases oral listing agreements are binding,[3] we agree with the Court of Appeal that there was no proof of the existence of an enforceable oral agreement between the seller and realtor for the payment of a commission, at any time, including the period after expiration of the October 24, 1979, contract. Nor is there any evidence of an extension of the listing agreement on the original five houses to cover commissions on the sale of other unspecified homes. 423 So.2d at 1228.
We have here then a realtor, who is a third party beneficiary of a lapsed contract, seeking to recover under some form of legal entitlement. His entitlement to relief must then depend upon some justifiable theory of recovery to be found in the jurisprudence.
Under our jurisprudence, a realtor can win a commission dispute, if he is the procuring cause of the sale, or if the principal would otherwise enjoy an unjust enrichment at the broker's expense. Grace Realty Co. v. Peytavin Planting Co., 156 La. 93, 100 So. 62 (1924). Neither situation is presented in the case before us.
Procuring cause has been defined as
a cause originating or setting in motion a series of events which, without break in their continuity, result in the accomplishment *821 of the prime object of the employment of the broker, which may variously be a sale or exchange of the principal's property, an ultimate agreement between the principal and a prospective contracting party, or the procurement of a purchaser who is ready, willing and able to buy on the principal's terms. Sleet v. Harding, 383 So.2d 122 at 124 (La.App. 3rd Cir.1980); Cramer v. Guerico, 331 So.2d 550 at 552 (La.App. 1st Cir.1976); Sleet v. Williams, 291 So.2d 495 at 498 (La.App. 3rd Cir.1974)
We do not have here a situation where the broker was the "cause originating or setting in motion a series of events which, without break in their continuity," resulted in the accomplishment of the sale of the principal's property. The broker in this case simply was not the moving cause of the sale. Nor did she diligently see the sale to its appropriate conclusion. The mere fact that the sale may in some way have been advanced by the previous efforts of a broker does not of itself entitle the broker to a commission. Bullis & Thomas v. Cavert, 162 La. 378, 110 So. 621 (1926).
In this case, the builders, perhaps as a professional courtesy, and in an effort to maintain a harmonious business relationship with a broker with whom they had successful and profitable dealings in the past, introduced the buyer to the agent at a time when for all intents and purposes the buyer had already been procured. At the point of introduction, all that was left was the ironing out of details, the working out of particulars and the assembling of data required by the lending institution. As it was, the agent's attempts to help expedite the buyer's loan application for acceptance before the purchase agreement's expiration, proved fruitless.[4]
We conclude then that Jesse Martin Realty Mart was not the procuring cause of the sale.
The trial court, however, did not rely upon any contractual relationship between the broker and the purchaser nor upon any notion of procuring cause. Instead the trial judge awarded $1500 for services performed, "as a result of whatever agreement was reached between the parties ... on a quantum meruit basis." The Court of Appeal took issue with the quantum meruit award, and also found no unjust enrichment. We agree with this conclusion.
As noted by the Court of Appeal, there is no equitable theory by which Jesse Martin Realty Mart may recover a commission in this case. The intent of the parties is evident and lawful, so La.C.C. art. 1963 bars any resort to equity in that regard.[5] This is not a case involving the transaction of another's business, nor the payment of a thing not due, the two types of quasi-contracts specifically recognized under La.C.C. art. 2294.[6] Nor does this case fall within the more general principle of unjust enrichment or actio de in rem verso.
The five criteria for an actio de in rem verso as established by our jurisprudence are the following:
(1) there must be an enrichment,
(2) there must be an impoverishment,
(3) there must be a connection between the enrichment and resulting impoverishment,

*822 (4) there must be an absence of justification or cause for the enrichment and impoverishment, and
(5) There must be no other remedy at law available to plaintiff.
Edmonston v. A-Second Mortgage Co., 289 So.2d 166 (La.1974); Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1967).
It perhaps can be urged that the builder was enriched (he saved paying a broker's commission); that there was an impoverishment (the broker failed to earn a commission) and a connection between the enrichment and the impoverishment (the commission the owner did not pay was the same commission the relator did not earn); and that there was no other remedy at law available to the plaintiff (he had no contractual right). However it seems clear that the fourth of the five requirements for actio de in rem verso is missing in this case: that is, "an absence of justification or cause for the enrichment and impoverishment."
Edmonston v. A. Second Mortgage Co., supra, one of the two leading cases on actio de in rem verso in the jurisprudence of this Court (the other is Minyard c. Curtis Products, supra) suggests the type of case in which can be found the required "absence of justification or cause for the enrichment and impoverishment." For example, in Edmonston, there was in effect a windfall to the A-Second Mortgage Company. Under no stretch of law or logic was the A-Second Mortgage Company entitled to benefit from the application of the Edmonston insurance proceeds to retire the first mortgage on the property.[7]
We said in Edmonston at 289 So.2d 122:
"Cause" is not in this instance assigned the meaning commonly associated with contracts, but, rather, it means that the enrichment is justified if it is the result of, or finds its explanation in, the terms of a valid juridical act between the impoverishee (Mrs. Edmonston) and the enrichee (A-Second) or between a third party (Standard) and the enrichee. A valid juridical act with the enrichee is essential to a finding of "cause". Nicholas, Unjustified Enrichment in the Civil Law and Louisiana Law, Part I, 36 Tul.L.Rev. 622 (1962).
* * * * * *
If cause is found, the enrichment is not unjustified and the attempt to invoke the actio de in rem verso must fail. For it is not every unjust enrichment which warrants the resort to equity; only the unjust enrichment for which there is no justification in law or contract allows equity a role in the adjudication.
In this case, we do not find that there was "an absence of justification or cause for the enrichment and impoverishment." We find, as did the Court of Appeal, that indeed there was cause for the enrichment in this case. It is only in how we perceive that cause for the builder-seller's enrichment that we differ with our brethren on the appellate court.
It was not just the expiration of the October 24, 1979, agreement to purchase that justified the builder's "enrichment" on the March sale of property to the Gaudets. His enrichment, if one chooses to call it that, was the result of his investment of skill, time, labor and financing and his good fortune in his finding a buyer. Since, as discussed earlier, the agent had no legal right to the fee either under contract or under our jurisprudence concerning procuring *823 cause, the profit that the builder enjoyed on the sale of his property after expending time, money, and energy to complete construction of the house is not a windfall, nor somehow undeserved. Rather it is a profit to which he is properly entitled. Admittedly this profit is increased slightly by his not paying a commission. But, as discussed before, there was no obligation on his part, by contract or otherwise to pay a commission.
Although the agent and the builder had previously enjoyed a business relationship in negotiations with the Gaudets concerning the Nottingham house, and as party and third party beneficiary to an earlier contract, that relationship had come to an end when the October 24, 1979, agreement to purchase expired on January 8, 1980, and when the builder became aware that the agent was no longer acting on his behalf or in his interest in the sale of the house to Gaudet.
There is no theory, legal or equitable, under which a commission is owed Jesse Martin Realty Mart, Inc.

DECREE
For the foregoing reasons, the judgment of the Court of Appeal is affirmed.
AFFIRMED.
DENNIS, J., concurs.
NOTES
[1] From January 30, 1980, there were only six weeks before March 15, 1980, when the Gaudets had to move out of their Westwego house. According to the realtor, fourteen weeks were usually "allowed" for new house construction.
[2] In addition to the proposed extension of the October 24, 1979, agreement, the Gaudets considered storing their furniture in a garage on the construction site, moving in with their daughter who also lived on the west bank, living and storing furniture with a son on the east bank, renting an apartment temporarily, or buying other already-existing property into which they could move within six weeks' time.
[3] Samuel v. Firestone, 342 So.2d 661 (La. 1977); Whatley v. McMillan, 152 La. 978, 94 So. 905 (1922); Olympic Homes, Inc. v. Ory, 207 So.2d 258 (La.App. 1st Cir), writ refused, 252 La. 113, 209 So.2d 41 (1968).
[4] Compare, Sleet v. Gray, 351 So.2d 286 (La. App. 3rd Cir.1977) where a broker without a listing agreement was permitted to recover a commission when the broker was the procuring cause and the sale was a direct result of an agreement which the broker negotiated on behalf of the seller. The reason the sale had not taken place within the specified time limit (but only later) was because of the buyer's recalcitrance.
[5] La.C.C. art. 1963 provides:

When the intent of the parties is evident and lawful, neither equity nor usage can be resorted to, in order to enlarge or restrain that intent, nor can any law operate to that effect, unless it be some prohibition or other provision, which the parties had no right to modify or renounce.
[6] La.C.C. art. 2294 provides:

All acts, from which there results an obligation without any agreement, in the manner expressed in the preceding article, form quasi contracts. But there are two principal kinds which give rise to them, to wit: The transaction of another's business, and the payment of a thing not due.
[7] When the Edmonstons were in financial difficulties, A-Second Mortgage took over the property, cancelling their second mortgage and relieving the Edmonston's from further financial obligations on the property by assuming the first mortgage. In effect, A-Second Mortgage bought the house and land for an express price, consisting of the outstanding balances on the first and second mortgages. Then, when the insured mortgagee (Mr. Edmonston) died accidentally, and the proceeds of his life insurance contract were paid to the first mortgage creditor to retire the debt on the property (the first mortgage creditor being the loss payee on the insurance policy), A-Second Mortgage enjoyed a windfall debt cancellation in that amount. Mrs. Edmonston's patrimony was decreased when the insurance proceeds to which she was beneficiary was diverted to retire A-Second Mortgage's debt obligation rather than paid into her estate.