## COMMONWEALTH CAPITAL CORPORATION

v.

## ENTERPRISE FEDERAL SAVINGS AND LOAN ASSOCIATION.

Civ. A. No. 84–1572.

United States District Court,
E.D. Louisiana.

March 25, 1986.

William A. Just, New Orleans, La., for plaintiff.

William J. Scheffler, III, Gretna, La., for defendant.

## ORDER AND REASONS

LIVAUDAIS, District Judge.

The parties submitted this matter for decision on the briefs and a joint stipulation of facts. Now, after a review of the record and the materials submitted by the parties, I find as follows.

FACTS

This dispute arises from a brokerage contract between the plaintiff, a deposit broker, and the defendant, a federally insured bank. Under that contract, which was dated November 3, 1980 and signed by the defendant's president, the plaintiff was to search for and supply to the defendant large deposit accounts, and was to receive a 1% commission (pro-rated annually) on any amount received by the defendant as a result of its efforts. In addition, the contract provided that the plaintiff was to be the exclusive broker in respect to the investors it provided to the defendant, and stated that the plaintiff was to recover its fee for any amount deposited with the defendant by plaintiff's investors, whether the plaintiff was directly responsible for the deposit or not.

On November 14, 1980, the defendant received its first deposit as a result of the plaintiff's efforts, and promptly paid the plaintiff as required by the contract. This was to be the first of a series of deposits made through the plaintiff's efforts, and duly paid for by the defendant. Apparently, the parties enjoyed a good business relationship for a full two years, during which time the plaintiff arranged for a number of deposits on defendant's behalf.

The parties' relationship began to deteriorate in early 1983, when the plaintiff learned that the defendant had accepted a deposit from an investor originally introduced by the plaintiff. It appears that the defendant had accepted this deposit from another deposit broker with whom it did business, while neglecting to pay the plaintiff its commission as provided for in their agreement. The plaintiff sent the defendant bills for this deposit, and received payment promptly, even though this meant that the defendant paid two brokers for the same transaction.

In June, 1983 the plaintiff learned that the defendant had accepted three additional deposits from plaintiff's investors without paying the commission called for in their agreement, and sent the defendant an invoice dated July 4, 1983, for those transactions. The defendant replied to the invoice by its letter of July 18, 1983, in which it denied any liability to the plaintiff, claimed that it had paid another broker for the transactions billed, and informed the plaintiff that it no longer wished to use its services. The plaintiff then sent a second letter requesting payment, and, when that letter went unanswered, made formal demand for payment through its lawyer.

The defendant has not dealt with the plaintiff since this series of letters, but has continued to accept deposits from investors originally discovered by the plaintiff, and has paid the plaintiff nothing for those transactions. As a result, the plaintiff filed suit on March 31, 1984, alleging damages in the amount of $47,825.09 arising from the defendant's refusal to pay sums allegedly owed to the plaintiff under its contract, for transactions which occurred between November of 1982 and October of 1984.

THE ISSUES

The plaintiff maintains that the parties have a valid contract which created in the plaintiff an exclusive right to broker the funds of certain investors (those originally supplied by it) to the defendant. It argues that under the Louisiana Civil Code, the defendant could not unilaterally abrogate

the contract it had with plaintiff. In the alternative, the plaintiff argues that even if the contract *was* terminable by the defendant, the defendant should be required to give the plaintiff reasonable notice, and the plaintiff should recover its fee for any transaction engaged in during the period determined to be reasonable by law. Lastly, the plaintiff suggests that the defendant has been unjustly enriched by the information it has acquired from the plaintiff, and plaintiff prays to recover the value of that information.

Defendant responds by arguing that the contract at issue in this case is a simple contract of agency or mandate, revocable at any time by either of the parties. It further argues that the July, 1983 correspondence of the parties served to terminate the contract between the parties, and that because the plaintiff was not the "procuring cause" of the transactions sued upon, it cannot recover any brokerage fee.

DISCUSSION

1. *The Nature of the Parties' Relationship*

The contract at issue is in the form of a letter agreement, and reads in full:

> In consideration of services rendered in securing deposits for this institution, we irrevocably agree to pay you negotiated fee immediately upon receipt of funds, via wire as you may direct. If these funds remain with this institutuion [sic] at their maturity, we will recognize them as new deposits arranged by you.
>
> In the absence of other fee agreement, your fee shall be 1% per annum based on a 360 day year and pro-rated for the term of the deposit.
>
> We recognize that your knowledge and your contacts are your stock in trade and their value to us will be measured by the amount of funds we may secure from time to time from them.
>
> We irrevocably agree that, once you have arranged for a depositor to contact us for the purpose of placing funds in our institution, we will thereafter recognize your fee for any funds placed with us.
>
> We further agree that, because your knowledge and your contacts are your stock in trade and that any disclosure to third parties or any procedure or contact that you may disclose to us may harm your competitive position, we therefore agree to maintain any information disclosed to us in the strictest confidense [sic], making use of it only where there is mutual benefit and generating fees for you as described above.
>
> It is our intention to observe the spirit as well as the letter of this agreement for our mutual benefit.
>
> I am authorized to execute this on behalf of this institution.
>
> /s/

As plaintiff points out, this agreement satisfies all the requisites for a contract under the Civil Code, and is governed by the provisions of the Code relating to contractual obligation. However, this contract is also a contract of a certain kind; it is a mandatary contract, establishing an agency relationship between the parties in which the plaintiff is to negotiate for certain deposits and then broker them to the defendant. Therefore, it is governed by the Civil Code's specific provisions relating to mandatary contracts (LSA–C.C. art. 2985 et seq.) as well as the general contract law. Thus, I am to read the agreement as a whole to discover the intent of the parties, attempting to interpret each clause in such a way as to give it effect, while reading all the clauses together to obtain the sense that results from the entire contract. LSA–C.C. arts. 1945, 1951, 1955. But I must also conform my interpretation of this contract to the Code provisions relating to mandatary relations.

The first issue raised by the parties concerns the type of mandatary relationship established by this contract. The plaintiff argues in its trial brief that the contract granted it an exclusive right to sell, similar to that often found in real estate brokerage contracts. *See, e.g., Arender v. Williams,* 364 So.2d 1048, 1050 (La.App. 2 Cir.1978); *Burr v. Leguin,* 365 So.2d 1156, 1158 (La.

App. 3 Cir.1979); *Miller v. Aguilar/Wilson, Inc.*, 435 So.2d 1069, 1070 (La.App. 1 Cir.1983). As explained by the *Burr* Court, the primary characteristic of an exclusive right to sell, as opposed to an exclusive agency to sell is:

> ... a contract giving [the broker] the exclusive right to sell during a specified period of time, he is entitled to a commission upon any sale of the property made during that time, whether the sale be made by the owner personally or by another broker.

*Burr, supra,* at 1158, quoting *Donlon v. Babin,* 44 So.2d 134 (La.App. 1 Cir.1950).

I agree with the plaintiff that such a relationship was created by the contract. The plain language in the contract establishes that the plaintiff shall have a right to collect its fee any time that one of the investors it has brokered to the plaintiff rolls over its account or invests further funds, whether or not the plaintiff has anything to do with arranging for those investments. That is, the plaintiff is to have an exclusive right to broker funds to the plaintiff from certain specified sources during the life of the contract. There is nothing in the contract to suggest any ambiguity on this point, other than a spelling error in paragraph one, and the lack of a specific term of duration, which is not fatal to the formation of a contract in Louisiana. LSA–C.C. art. 1779.[1]

Accordingly, I rule that the plaintiff may recover on all accounts owed by the defendant for transactions engaged in during the period prior to July 18, 1983. This would include invoice number 220798, invoice number 221204, and invoice number 221092. The total amount shown to be owed by the defendant for these invoices is $15,522.21. Plaintiff's claims for other invoices will not be allowed, however, for the following reasons.

### 2. Could the Contract be Terminated Unilaterally?

■ As noted above, this is a mandatary contract, or contract for agency. The Civil Code provides that such contracts are terminable at will by either party.[2] LSA–C.C. arts. 3027, 3028. The only exceptions to this rule are irrevocable powers of attorney, and the judicially created doctrine which allows that agencies "coupled with an interest" are irrevocable. *See, e.g., Landreneau v. Granger,* 401 So.2d 634, 636 (La.App. 3 Cir.1981); *Montgomery v. Foreman,* 410 So.2d 1160, 1166 (La.App. 3 Cir.1982); *Kinsey v. Dixon,* 467 So.2d 862, 863, 864 (La.App. 2 Cir.1985). Agencies coupled with an interest are those which grant the agent a right in the property with which he deals on the principal's behalf. *Id.* This right must be a right in the property itself (e.g. a right to encumber it), not a mere expectancy like a fee or commission. *Montgomery,* at 1165, 1166. In the case at bench, the plaintiff had no right in the funds it brokered to the defendant. It merely had the right to collect commissions on the brokerage of them. Thus, the mandate granted to the plaintiff in this case could be revoked by either party.

Plaintiff argues in its brief that the defendant never revoked the mandate in certain terms. This statement could only be made in the heat of legal affray: defendant's July 18, 1983 letter states "we no

---

1. Of course, the lack of a specific term of duration might render a contract for an exclusive right to sell invalid in some circumstances. For the lack of a specific term would imply that the agent would recover its fee anytime the property in which it deals is sold (or, in this case, any time a deposit is made on behalf of certain funds), from the time the contract is made forward in time ad infinitum. This would be an absurd result (i.e. do the parties before me really intend that the plaintiff should recover if a fund which it had originally brokered to the defendant in 1980 should make a deposit in the year 2100?). This is not a problem here, how-ever, because the contract at issue is terminable at the will of either party, as will be shown more fully below.

2. The use of the word "irrevocable" in the contract appears to be huffing and puffing on the part of the plaintiff, rather than an attempt to set a term of duration. And as noted in footnote one above, it would be absurd to find that a brokerage contract is irrevocable and without a time limit. And absurd conclusions are proscribed by the Civil Code, LSA–C.C. art. 1945.

longer desire using you as one of our savings broker [sic] therefore, please remove us from your phone list." Defendant might have terminated its relationship with the plaintiff more rudely, but it could hardly have done so in more certain and sufficient terms.

### 3. Was the Plaintiff Entitled to Notice of Termination?

■ Plaintiff cites three cases for the proposition that contracts which do not specify a term of duration are terminable only on reasonable notice under the Louisiana law. *Standard Plumbing Supply v. United States Steel Co.*, 530 F.Supp. 580, 581 (M.D.La.1982); *Caston v. Woman's Hospital Foundation*, 262 So.2d 62, 65 (La. App. 1 Cir.1972); *Daily States Publishing Co. v. Uhalt*, 169 La. 893, 126 So. 228, 232 (1930); LSA–C.C. art. 1778. Under these cases, the notice period required in any given case must be determined in light of the facts of the case. *Caston, supra,* at 65. And when a notice period is required and not complied with by the defendant, a plaintiff may recover damages for sums it would earn during the notice period. *Standard Plumbing, supra,* at 583.

I doubt very much whether a brokerage contract of the kind at issue here requires any notice period before it is terminated. In the vast majority of cases concerning brokerage contracts, obligations are terminated with no notice, or very little notice. *See, e.g., Jackson v. Free*, 442 So.2d 1346 (La.App. 3 Cir.1983) (15 day notice of termination); *Fowler v. Phillips*, 159 La. 668, 106 So. 26 (1925) (Under LSA–C.C. art. 3028, principal may revoke mandate at any time, unless a notice period is specified in the contract of mandate). In the case at bench, no term was specified in the contract, and thus, probably, none was required.

Moreover, even if I were to find that a notice period was required in this case, I would find that the period need not exceed 30 days. None of the special circumstances found in *Standard Plumbing* and *Caston* are present here (in both those cases,

the plaintiffs had significantly altered their business posture in reliance on their contracts with the defendants, entitling them to a notice period before termination). Here, the relationship between the plaintiff and the defendant appears to have been the plaintiff's stock-in-trade, and caused no special adjustment of its business practices.

And even granting that the plaintiff was entitled to a 30 day notice period will not result in any award of damages to it for transactions occurring during the period allowed. *See Standard Plumbing Supply, supra,* at 583. This is so for the simple reason that the defendant engaged in no transactions with any depositors originally brokered to it by the plaintiff until 90 days after it terminated the agreement by its letter of July 18, 1983. *See* Plaintiff's Exhibit P–1. Plaintiff's attempt to recover damages for a notice period is, therefore, unavailing.

### 4. Was the Plaintiff the Procuring Cause of Any of the Transactions After July 18, 1983?

The plaintiff's final legal argument in support of its claim for fees earned for transactions occurring after July 18, 1983 is that it was the procuring cause of those transactions. "Procuring cause" means:

[A] cause originating or setting in motion a series of events which, without break in their continuity, result in the accomplishment of the prime object of the employment of the broker, which may variously be a sale or exchange of the principal's property, an ultimate agreement between the principal and a prospective contracting party, or the procurement of a purchaser who is ready, willing and able to buy on the principal's terms. [citations omitted]

*Creely v. Leisure Living, Inc.*, 437 So.2d 816 at 820–821 (1983). Louisiana jurisprudence has long recognized that a broker is entitled to his fee whenever he is the procuring cause of a transaction, even if that transaction occurs after the brokerage contract has ended. *Guillory v. Hixon*, 319 So.2d 475, 477 (La.App. 3 Cir.1975); *Sleet*

*v. Harding,* 383 So.2d 122 (La.App. 3 Cir. 1980). But the broker must show more than the mere fact that his actions in some way aided the sale; he must show that his efforts amounted to something like the efficient cause of the transaction sued upon. *See Snyder v. Champion Realty Corp.,* 631 F.2d 1253, 1255 at fn. 3 (5 Cir.1980); *Creely, supra,* at 821.

■ I do not believe that the plaintiff was the procuring cause of the transactions complained of here. As noted above, the earliest transaction entered by the plaintiff with one of the accounts originally introduced by the defendant occurred a full 90 days after the contract ended. All of the transactions entered after July 18, 1983 involved the services of brokers other than the plaintiff. All of the transactions sued upon involved depositors of an institutional nature, who are likely to have brokerage relationships with a number of services like the plaintiff's. And there is nothing in the record to suggest that these later deposits were connected to the deposits originally brokered by the plaintiff—in fact, all the deposits were new. In this situation, I cannot say that the plaintiff's actions "set in motion a series of events which, without break in their continuity result[ed] ... in agreement between the principal and a prospective contracting party."

The result would be different if the plaintiff had shown that any of the deposits made after July 18, 1983 were the result of "rolling over" old deposits, or if it had shown that it alone knew of the depositors it brokered to the defendant and that the defendant had leaked these sources to other brokers. In either one of these situations, it would be fair to say that the plaintiff was the substantial and efficient cause of the later deposits, and would have been the procuring cause of them. But the plaintiff proved neither of these things, and I find that the plaintiff was not the procuring cause of any of the transactions sued upon which occurred after July 18, 1983.

5. *Was the Defendant Unjustly Enriched?*

■ Plaintiff's final claim for relief is founded on the equitable principle of unjust enrichment, or *actio de in rem verso,* as established in the Louisiana jurisprudence. At the outset, I note that this claim cannot apply to those transactions occurring before July 18, 1983, because those transactions are governed by the contract between the parties, and the Civil Code provides that such transactions are beyond the reach of equity. *See Creely, supra,* at 821; *Huval Tractor Inc. v. Journet,* 452 So.2d 373 (La.App. 3 Cir.1984); LSA–C.C. arts. 1963, 1965, and 1967. However, it may apply to those transactions after July 18, 1983, since those transactions are *not* governed by the contract. Apparently, then, plaintiff's claim for unjust enrichment is limited to the allegation that defendant received an undue and unjust advantage as a result of the information it received about certain depositors from the transactions it engaged in with the plaintiff prior to July 18, 1983. This information, plaintiff suggests, allowed the defendant to profit (without paying any fee) by entering into transactions with depositors originally introduced by the plaintiff.

The five criteria for an *actio de in rem verso* are:

(1) there must be an enrichment,

(2) there must be an impoverishment,

(3) there must be a connection between the enrichment and resulting impoverishment,

(4) there must be an absence of justification for the enrichment and impoverishment, and

(5) there must be no other remedy at law available to the plaintiff.

*Creely, supra,* at 821–822; *Minyard v. Curtis Products, Inc.,* 251 La. 624, 205 So.2d 422 (1967). The plaintiff has failed to satisfy the first of these criteria because it has not proven that the defendant used the information it learned from the plaintiff to enrich itself. If the plaintiff had shown that the defendant had in some way employed that information for its profit (e.g. by leaking its knowledge of sources of deposit to other brokers and receiving a

reduced fee), then an enrichment of the defendant might be found. But nothing like this was ever proven. Instead, the evidence indicates that the sources made available by the plaintiff were available to all those who brokered deposits, and therefore, defendant's dealings with the plaintiff do not seem to have specially enriched it in any way that would warrant recovery.

CONCLUSION

Let judgment be entered on behalf of the plaintiff for the sum of $15,522.21, with interest at the rate provided by statute, with the interest to run from July 22, 1983, the date of plaintiff's demand for payment. LSA–C.C. art. 1935; *Wood v. Kelly*, 359 So.2d 742 (La.App. 4 Cir.1978).