NORRIS, Judge.
Malkem International Corporation appeals a bench trial judgment in favor of the plaintiff, Tylon Blanton, for wages, penalties and attorney fees pursuant to La.R.S. 23:631. We conclude that the trial court was not plainly wrong in finding that Malkem violated the statute and raised improper setoffs in an effort to reduce its obligation to Blanton. We amend the award of wages to reflect one proper setoff, but otherwise affirm the award of wages and penalties. We also find the trial court was not plainly wrong to assess attorney fees; however, the particular fee imposed is excessive and must be lowered. We amend and affirm the judgment accordingly.

Factual background

Blanton is an experienced salesman of specialty chemicals for industrial uses. Like other employees and principals of Malkem, he was formerly employed by Malter Corporation, an older specialty chemical company. In the late 1980s one of Matter’s stockholders, Walter Davis III, and one of its former officers, Michael Manning, formed a competitor, Malkem. Apparently Davis’s move prompted Malter to sue Davis; that litigation was not directly discussed at the instant trial, but perhaps because of it Davis was somewhat evasive about his role in helping to start Malkem. He admitted loaning Man *180 ning about $50,000 in 1988 to start up the company, and was actively involved in Malk-em’s hiring and firing; however, he always denied having any connection with Malkem except as a consultant. Manning identified himself as the sole shareholder, president and CEO of Malkem.
Once in operation, Malkem apparently recruited much of its small staff from Malter. Blanton met several times with Davis, Manning and another Malkem principal named Charles Hinyup, and eventually agreed to join Malkem as a commission salesman. Blanton came with his best account, St. Francis Medical Center in Monroe. Under the terms of their agreement, Blanton worked for a 30% commission, and although he started as an independent contractor, within a few months he asked Manning to treat him as an employee, and Manning agreed.
Because Malkem was new in the business and not yet on firm financial footing, it could not pay its salesmen their commissions until the accounts were received. Blanton initially agreed to this because, he testified, his accounts always came in promptly. His commissions in 1989 came to $77,903, and in 1990, $125,817. In addition to this, Manning also gave Blanton additional compensation starting in May 1990: auto allowance of $500 per month, health insurance allowance of $340 per month, and life insurance of $334 per quarter. Malkem also declared a bonus in September 1990 for the fiscal year that ended June 1990; this gave Blanton an additional $5,000 (Davis testified that Blanton’s auto and insurance allowances were to be in lieu of future bonuses). Blanton was Malk-em’s most proficient salesman, bringing in over three times as much as the next highest salesman.
Despite Blanton’s apparent success with the company, Davis met with him on January 2,1991 to tell him his services were no longer needed; Blanton was summarily fired by Malkem’s “consultant.” Because the instant suit is not one for wrongful termination, Davis and Manning’s reasons for discharging Blanton were skirted at trial. Several minor disputes, which later appeared as claims for setoffs, are discussed later in the opinion.
Davis told Blanton he was fired on January 2, 1991. Manning confirmed this by letter dated January 7. The letter advised that Malkem would pay Blanton any commissions due in 90 days; however, Blanton was “to be responsible” for 20 drums of liquid ice melter that Malkem had previously shipped to Blanton’s used car lot in Springhill, and for all the monies that Blanton’s son owed Malkem. Blanton responded by letter of January 8, demanding immediate payment of “all commissions due me for sales made by me prior to January 2.”
Over a month later, on February 11, 1991, Malkem’s attorney in Gretna replied by letter with two commission statements. The first of these showed that as of December 31, 1990, Blanton was owed, after deductions for taxes, $2,160.41 (but Malkem did not attempt to calculate this amount or tender it within three days of Blanton’s termination). The second statement, dated January 31, 1991, showed that Blanton was owed, after deductions for taxes and setoffs, $4,030.07. The letter stated that Blanton was due the total, $6,190.48, but that Malkem would not pay this until Blanton returned the 20 drums of ice melter “as per the terms of your consignment agreement with Malkem[.]” Malkem made no further mention of the money that Blanton’s son allegedly owed Malkem; at trial, Blanton denied he was responsible for the loan. Shortly after this letter, Blanton loaded the drums onto Malkem’s carrier in Springhill.
On March 4, Malkem’s attorney in Gretna advised Blanton that they had received the chemicals, and sent him a check. The letter referred to “miscellaneous other documentation” to show why the check was lower than before. According to Malkem’s figures, Blanton was now due commissions of $8,979.66, but this was offset by $1,699.50 for water treatment chemicals that St. Francis Medical Center returned to Malkem after Blanton was terminated; by $992.25 for return freight on the 20 drums of ice melter and on the water treatment chemicals from St. Francis; by $68.10 to clean and relabel the drums of ice melter; and by $61.03 for an unrelated delinquent account. After tax withholdings of $1,477.61, Malkem figured *181 Blanton was due $4,681.17. The letter stated that the check, when accepted, would be “in full satisfaction of all the monies due you from Malkem.”
Blanton filed the instant suit within two weeks, on March 12, 1991. By June 1991, Malkem’s local counsel (in Minden, Louisiana) advised Blanton that he could cash the cheek unconditionally, but otherwise nothing of record occurred between then and the time of trial in February and May 1992.

Action of the trial court

At trial, much of the testimony focused on ¶ 4 of Blanton’s petition, in which he claimed that he was to have received a bonus equal to 5% of corporate stock. The testimony, however, showed that this “bonus” was nothing more than talk that initial employees may have been able to purchase a 5% share in the corporation. In fact, nearly as much time was devoted to developing the stock claim as to the circumstances of Blanton’s employment and to Malkem’s setoffs. By written opinion of February 11, 1993, the trial court rejected this claim, finding that while “certainly discussions were had concerning” it, the nature of the discussions was still in dispute and there was insufficient evidence on which to find that Blanton was entitled to stock or bonuses from the company. R. p. 25.
On his other claims, however, the court found that Blanton had easily (“clearly and convincingly”) proved his ease. The court therefore awarded him $7,602.13 for unpaid commissions and $947.00 in benefits (car allowance and insurance); statutory penalties of $45,963.00; and attorney fees of $15,-465.75, all subject to a credit of $4,681.17, the amount of the check that Malkem had previously tendered. Finally, the court rejected Malkem’s claims for setoff, discussing only one, the returned chemicals from St. Francis Medical Center. The court found this buyback “sui generis in the entire history of the company” and “a sly attempt to lower plaintiffs commission,” an arrangement which “does not pass the ‘sniff test.” Judgment was rendered accordingly.

Applicable law

Louisiana law requires the employer to settle up with his former employee within three days after the employee’s discharge or resignation. La.R.S. 23:631 A. This protection extends to any “employee of any kind whatever” and affords the employee relief “whether the employment is by the hour, day, week, or month[.]” Id. Commissions are considered wages for purposes of the statute. Potvin v. Wright’s Sound Gallery Inc., 568 So.2d 623 (La.App. 2d Cir.1990). In the event of a dispute over the amount due, the employer must pay the undisputed portion of the claimed wage within the three-day period. R.S. 23:631 B. This payment must be tendered without any conditions. Tompkins v. Schering Corp., 441 So.2d 455 (La.App. 2d Cir.1983).
Failure to comply with these requirements makes the employer liable for penalties equal to 90 days’ wages, or else full wages from the date of the employee’s demand until paid or tendered, whichever is less. La.R.S. 23:632. Because these sections are penal in nature, they must be strictly construed. Franklin v. Ram Inc. (of Arkansas), 576 So.2d 546 (La.App. 2d Cir.1991). Thus courts often decline to impose penalties when the amount owed is subject to a bona fide dispute, and the employer offers a reasonable basis for resisting payment. See Carriere v. Pee Wee’s Equipment Co., 364 So.2d 555 (La.1978); Glover v. Diving Services Int'l, 577 So.2d 1103 (La.App. 1st Cir.1991). Attorney fees are authorized against an employer “in the event of a well-founded suit for any unpaid wages whatsoever.” R.S. 23:632; Pearce v. Austin, 465 So.2d 868 (La.App. 2d Cir.1985). Attorney fees, however, are subject to review and control by the courts. Leenerts Farms Inc. v. Rogers, 421 So.2d 216 (La.1982).
In civil cases, the appellate court may reverse the trial court only when the latter’s findings are plainly wrong. Rosell v. Esco, 549 So.2d 840 (La.1989).

Discussion: Past due wages and penalties

By its first two assignments of error, Malkem urges the trial court erred in finding *182 that Malkem owed Blanton any wages after his termination, in light of its allegedly good faith, equitable defenses. Malkem conceded as early as January 7 that it owed Blanton some commissions and other compensation on the day he was terminated.
The thrust of Malkem’s argument is that it should be absolved of penalties and attorney fees because it had equitable, good faith set-offs to Blanton’s wage claims. Cerriere v. Pee Wee’s Equipment Co., supra. Citing the testimony of President Manning, Malkem urges that it was customary in the trade or practice for commissions to be paid only 90 days after sales; and that Blanton tacitly consented to this from the beginning of his employment. In support, Malkem cites Hess v. Pembo, 422 So.2d 503 (La.App. 4th Cir.1982), a case involving an employee at an employment agency. There, both the employer and the employee testified that the agency had a “guaranty period” of 60 to 90 days. During this time a client placed by the agency could quit his or her job and would owe no commission; when this occurred, the commission previously credited to the employee who placed the client would be “charged back.” In Hess, both the trial court and the court of appeal found that the employee was aware of this policy and consented to it, thus absolving the employer from the statutory duty to pay a contested commission within three days. While we do not disagree with the holding of Hess upon the facts there presented, we would note that courts are usually reluctant to find a waiver of the employee’s statutory rights under 23:631. See Thomas v. Maxwell Hardware & Lumber Co., 505 So.2d 899 (La.App. 2d Cir.1987); Holmes v. Tradigrain Inc., 411 So.2d 1132 (La.App. 4th Cir.), writ denied 414 So.2d 1252 (1982).
In the instant case, Manning testified that Malkem had a “normal procedure” of waiting “about 90 days to settle up with any salesperson.” This was, he said, based on “prior experience with dealing with the other chemical company[.]” R. p. 228. Malkem claims in brief that Davis corroborated this, but the record does not show it; Davis stated that when he fired Blanton, he advised that the commissions would be paid within 90 days. R. p. 113. This is not evidence of a “normal procedure.” Moreover, Blanton contradicted it; by his account, the standard procedure is that when a salesman turns in an order, “a good clean order that’s a legitimate order,” he gets his commission on his next bi-monthly payday. R. p. 196. He admitted agreeing “in the beginning” to accept his commission “when the customers paid Malkem,” but this was only to accommodate Malkem in its formative period. Id. Blanton testified that his customers paid “promptly within 30 days or less[.]” Id. On this evidence, the trial court was not plainly wrong to find that there was no “normal procedure” for withholding commissions for 90 days or, if there was, to find that Blanton did not consent to it. At any rate, Malkem did not unconditionally tender the uncontested commissions within 90 days. On this conflicting testimony, we cannot say the trial court was plainly wrong to find no good faith defense.
The evidence of the alleged setoffs was equally contradictory. One large item was for a batch of water treatment chemicals that Blanton had sold to St. Francis Medical Center, generating a commission of $1,699.50. Manning testified that after Blan-ton left Malkem, St. Francis complained that it “could not use” the product. Davis, however, admitted there was no defect in the product, only that it did not suit the needs of a new air conditioning system later installed by St. Francis. Without consulting Blanton, Malkem took back the chemicals and charged back Blanton’s commission. Blanton testified that though he never had to accept a return before, it was “common practice” for the seller to trade out for something the customer could use. R. p. 209. This would have preserved his commission. On cross examination, Manning admitted that it was discretionary with the seller to take the product back or to swap for something the customer could use. R. p. 80. Davis claimed he “never heard of anybody taking one product and trading it.” R. p. 119. On this evidence the trial court was entitled to find that Malk-em’s conduct in taking back the water treatment product was a bad faith plan to diminish Blanton’s commission.
*183 Another large item was $2,200 in hospitalization premiums. The testimony shows that early in Blanton’s employment, Malkem agreed to carry him and his wife on its group plan and pay their premiums. After Malkem paid several premiums, Blanton’s wife was hospitalized. The insurer later denied coverage on the basis that she had a pre-existing condition; however, it refunded premiums of some $2,200 to Blanton, who applied them to the hospital bill and told Manning he would do so. R. pp. 198-199. In fact, Malkem sent Blanton premium money for months when he did not have a policy. R. p. 198. In brief Malkem urges the company should be able to offset this amount. It is clear, however, that Malkem always intended to pay Blanton’s hospitalization premiums, and whether Blan-ton applied the cash to an insurance policy or to a hospital bill did not matter. The trial court was not plainly wrong to disallow this setoff.
Several items of setoff arise from the ice melter that Blanton had had shipped to Springhill for sale later; ice melter is a seasonal product which he felt would sell better if he could deliver it to North Louisiana customers promptly. Right after the termination, Malkem told Blanton he would “be responsible for” this material. Malkem then claimed there was a consignment agreement which made Blanton responsible for returning the 20 drums to Malkem, and made this return a condition of repayment. Ex. PS. Next Malkem charged Blanton the cost of returning the ice melter and cleaning and relabeling the drums. Ex. P-4. At trial, Manning demanded an additional $800 to $1,500 to dispose of the chemical. R. p. 282. (True to the ever-growing setoff, Malkem now demands in brief $4,989 as the cost of producing the ice melter. Br., 8.) It is plain that the trial court was unfavorably impressed with Malkem’s shifting claims and viewed them as an ongoing scheme to defeat Blanton’s claim for commissions. This is not plainly wrong; Malkem obviously cannot claim both that it owned the chemicals (even offering to let Blanton sell them after he had been terminated) and that Blanton must pay for them. The trial court was within its discretion to find that Malkem’s changing positions with respect to the ice melter were in bad faith.
Most of the other claimed items of setoff— two return freight charges, the cost of promotional catalogs, and charges for cleaning and relabeling barrels — were presented with the same disputed and inconclusive evidence as the larger items. We see no need to discuss these claims individually; on the record presented, the trial court was not plainly wrong to dismiss each of them as improper for setting off and not good faith defenses to payment under the statute.
In brief Blanton concedes that one item, an unpaid account on which his commission was $68.10 (Malkem’s papers say $61.03), should be deducted from his award. We agree. The judgment will be amended by the amount Blanton concedes.
In sum, the court was not plainly wrong in finding that Malkem failed to pay Blanton the undisputed portion of his commissions and other compensation within three days of termination, as required by R.S. 23:631, and was in bad faith by asserting invalid setoffs to avoid payment. The award of wages and penalties will be amended to reflect the one valid setoff, and in all other respects affirmed.

Quantum of attorney fees

By its third assignment Malkem urges the trial court erred in awarding attorney fees; alternatively, it urges the fee was excessive. We have already found that the trial court was not in error to award penalties and fees. However, we have closely reviewed the award for excessiveness. Leenerts Farms Inc. v. Rogers, supra. Malkem contends that in other reported cases, attorney fees are primarily in the $750 to $2,150 range. See Carriere v. Pee Wee’s Equipment Co., supra, and Agnelly v. Lauricella, 383 So.2d 813 (La.App. 4th Cir.1980). These cases are somewhat old for gauging attorney fees. Blanton urges in brief that an hourly fee of $125 was approved in Krajcer v. D.H. Holmes Co., 571 So.2d 171 (La.App. 4th Cir.1990), writ denied 573 So.2d 1141 (1991). However, the total fee awarded in Krajcer, for both trial and appellate work, was $5,000. *184 Blanton also refers in brief to “Plaintiff Exhibit 8” in support of his fee, but we do not find that any such exhibit was ever filed. See R. p. 216. He testified that he contracted with his attorney for an hourly fee of $150, plus expenses. Id.
We have carefully reviewed the filings and transcript in this record. We agree that the case was more complicated than the ordinary wage case, and much of the difficulty resulted from Malkem’s efforts to oppose invalid defenses to Blanton’s claim. However, given that the documentation was not great and the legal principles not unduly complex, we cannot affirm a fee of 100-plus hours for pursuing the wage aspect of this case.
The transcript of the trial shows that Blan-ton and his counsel devoted considerable time to the claim for stock participation in Malkem. This testimony was developed in great detail. However, Blanton never showed that stock participation was part of his compensation scheme at Malkem. He even admitted at one point that the stock plan would only be effective when “things kind of lined out.” R. p. 193. The offer to sell stock, if such an offer existed, strikes us as a proposition separate from wages and not a part of Blanton’s compensation. See Rutledge v. CRC Holston Inc., 425 So.2d 364 (La.App. 3d Cir.1982), writ denied 429 So.2d 147 (1983). The excessive fee will therefore be reduced by the relative time and effort apparently dedicated to proving this unrecoverable item; we amend the fee to $10,000, the highest affirmable amount on this record.

Conclusion

For the reasons expressed, the judgment is amended to include a setoff of $68.10 to Blanton’s wages, and to reduce the attorney fee to $10,000.00. It is therefore ordered, adjudged and decreed that there be judgment in favor of Tylon Blanton, and against Malkem International Corporation, in the full sum of $64,444.03, less a credit of $4,681.17, together with legal interest from date of judicial demand until paid. The judgment is in all other respects affirmed.
Appellate costs are assessed to the parties equally.
AMENDED AND AFFIRMED.