MOORE, J.
Both sides appeal aspects of judgments that divided, between a real estate broker and its former agent, real estate sale commissions on two large sales, awarded the former agent lease commissions, and assessed penalty wages and an attorney fee against the broker. For the reasons expressed, we affirm in part, reverse in part, and render.
FACTUAL BACKGROUND
U.L. Coleman Co. ("ULCC") is a real estate broker in Shreveport with a large business in commercial sales, leases and property management. In July 1994, it hired Keitha Gosslee as a leasing agent and sales associate. ULCC designated her as an employee and paid her a monthly salary (initially $2,000) plus commissions on her leases and sales. Apparently, Ms. Gosslee was an energetic and successful agent, although ULCC's principal, Linc Coleman ("Coleman"), felt she was always angling for higher salary and bigger commissions.
They signed an employment agreement, December 1, 1995, which divided all commissions according to an attached schedule and recited that lease commissions were either paid monthly over the term of the lease or up front (most were monthly). Ms. Gosslee's lease commission was 37½%; in October 1997, ULCC increased this to 47¼%. By letter agreement in December 1999, ULCC added a 15% bonus commission if she exceeded a sale and lease volume of $137,500 in a given year; she exceeded the threshold every year and qualified for the bonus. None of these *787 agreements included a covenant not to compete.
On August 22, 1997, Tom Bradshaw, a developer for Walgreens, called ULCC and came in to discuss his company's plans to expand to north Louisiana and east Texas. This was an enormous deal, as Walgreens was looking to build perhaps 10 stores in the area. Coleman chose Ms. Gosslee to join the meeting, and they persuaded Bradshaw to sign an exclusive representation agreement with ULCC to identify and develop locations for new Walgreens stores. This agreement had a stated term of one year, but Coleman testified he considered it to be in force as long as ULCC was still providing services to Bradshaw. Coleman gave Ms. Gosslee the assignment, and she dove in energetically, as it was a career project.
Of relevance to this case, she worked to get suitable sites at the intersections of Pines Road and W. 70th St., in Shreveport; Shed Road at Airline Dr., in Bossier City; and Lamy Lane and Louisville Ave., in Monroe. Through July 23, 2001, she negotiated Bradshaw's purchase of five sites for new Walgreens locations. She and Coleman testified that in these transactions, the sale commission was divided 62½% to ULCC and 32½% to Ms. Gosslee.[1]
In July 2001, Ms. Gosslee resigned from ULCC. She left because she felt Coleman had reneged on a lucrative commission involving the Chase Bank building. Coincidentally, she had just obtained her own real estate broker's license, and could open her own real estate company.
Before leaving ULCC, Ms. Gosslee made a list of pending projects, including the Shed Rd. Walgreens. Coleman agreed she could complete these deals on ULCC's behalf. She closed on Shed Road in December 2001, at a price of $1.325 million, subject to a 5% commission, or $66,250, of which she remitted to ULCC only 47½%, feeling she was entitled to the 15% bonus for exceeding her threshold. She also had three pending commercial leases generating monthly lease commissions. Sometime after her departure, Coleman and his staff discovered that she had carried off a number of active files, including Walgreens files.
After leaving ULCC, Ms. Gosslee formed her own company, Keitha Gosslee & Associates ("KGA"). On August 21, 2001, she signed an exclusive representation agreement with Bradshaw for the Walgreens account. She then got back to work on the Pines Road and Lamy Lane projects. She closed a sale on Pines Road in November 2002, at a sale price of $1.16 million and 6% commission, and retained the whole commission, or $69,600. She closed a sale on Lamy Lane in May 2004, at a sale price of $1.225 million and 6.857% commission, and retained the whole commission, $84,000. There was much testimony regarding what (if anything) ULCC did to work these sales after Ms. Gosslee left.
PROCEDURAL HISTORY
ULCC filed this petition in November 2003 demanding the return of all active files Ms. Gosslee had taken from the office in 2001. It also alleged that ULCC was entitled to a share of the commission she earned on any Walgreens file that she closed after she left. By subsequent brief, ULCC argued that Ms. Gosslee wrongly withheld sale commissions of $105,937, and conceded that it (ULCC) had withheld her lease commissions of $27,875. It demanded the balance, $78,062.
Ms. Gosslee filed a denial, asserting that she and ULCC had no noncompetition agreement. She also reconvened, alleging *788 that she was entitled to lease commissions that ULCC had either not paid at all, or had paid without the 15% bonus commission to which she was entitled. She also alleged that commissions are deemed to be "wages" under the Payment of Employees Law, La. R.S. 23:631 -634, and ULCC's failure to remit them entitled her to the unpaid wages, 90 days' wages as a penalty, and reasonable attorney fees. By subsequent brief, she claimed she was due salary and commissions of $48,377, with penalty wages to be calculated.
The matter languished in discovery for several years. Trial began over two days in June 2012, before Judge Leon Emanuel. Over the first day, and half of the second, Coleman offered his interpretation of Ms. Gosslee's commission scheme and of the relationship with Bradshaw after Ms. Gosslee left ULCC. On the second day, Bradshaw testified, out of order, saying that after Ms. Gosslee left ULCC, he never heard another word out of Coleman or anybody else at ULCC. He bluntly described his exclusive representation agreement with ULCC as "dead" before he signed with KGA.
The trial recessed until June 26, but another (unspecified) delay intervened, and then Judge Emanuel retired (in December 2013). The trial finally resumed in April 2015, when it was heard over two days by Judge Mike Pitman, who stated for the record that he had read the transcript from 2012. The parties announced that in the interim, an important witness, Bradshaw, had died, and the court would have to rely on the transcript of his earlier testimony.
ULCC called its controller, David Lester, to describe in detail the different ways the company treated commissions for sales and for leases of managed and nonmanaged properties. ULCC spent some time trying to qualify a Benjamin Dowis III as an expert in real estate broker-agent relations, but the court refused to accept him.
Ms. Gosslee called Daniel Hutchinson, one of the owners of the Pines Road property. He admitted that in 2000, Ms. Gosslee had negotiated with him and his co-owner about buying their old Goodyear store, but the co-owner refused to sell at Bradshaw's price. By late fall 2001, however, Ms. Gosslee contacted them again about the same property, but this time she said Bradshaw would pay a $50,000 relocation fee, with an extra $50,000 on the purchase price; remarkably, the co-owner agreed, and the deal closed in November 2002. Hutchinson admitted that Ms. Gosslee had identified the property, negotiated and reached a purchase price before July 2001, but he felt that she had closed the deal on KGA's behalf, not ULCC's.
Ms. Gosslee then testified, giving her understanding of ULCC's commission structure. When she left, she was earning a commission of 31½% on nonmanaged and 47¼% on managed lease properties; however, after she left, ULCC paid her only 31½%, on all leases , including managed ones. She gave her account of the Pines Road deal, largely agreeing with Hutchinson. On the Lamy Lane deal, she testified that she had identified the southwest corner of the intersection and negotiated, unsuccessfully, with the owners in 2000. After she left ULCC, she identified the northeast corner and negotiated with those owners, closing the deal in May 2004. She felt she did not owe ULCC any portion of the commission on either of these deals. On cross-examination, she described in great detail the three commercial leases on which she had been receiving monthly commissions when she left ULCC. She felt that by securing those tenants and getting them to sign leases, she had earned her full commission, and it should not be reduced *789 simply because she was now off ULCC's payroll.
On rebuttal, Coleman described the culture and history of his company, largely repeating his testimony from 2012. He insisted that after Ms. Gosslee left, he still considered Bradshaw to be "his" client, but was "not sure" if he even talked to him until long after he signed with KGA. Also, Coleman strongly felt that only a "licensed employee" was entitled to receive the 15% bonus commission; after Ms. Gosslee left, he had every right to quit paying it. He also admitted "crediting" some of her lease commissions against the sale commissions he felt she owed ULCC for Pines Road and Lamy Lane.
ACTION OF THE TRIAL COURT
The court rendered an opinion in September 2015, finding: (1) ULCC was the "procuring cause" of the Pines Road deal and thus entitled to a portion of that commission; (2) ULCC was not the procuring cause of the Lamy Lane deal, and thus not entitled to a portion of that commission; (3) Ms. Gosslee was entitled to the 15% bonus on lease commissions withheld by ULCC from August to December 2001 (as well as a 15% bonus on the Shed Road deal); (4) she was not entitled to "higher commissions" for managed properties; and (5) she was not entitled to future renewal commissions. The court asked for supplemental briefs regarding quantum.
In February 2016, the court issued a supplemental opinion and rendered a judgment awarding Ms. Gosslee (1) unpaid lease commissions of $27,875, plus judicial interest from the date each commission was earned; (2) unpaid bonus commission of $3,653, plus interest from the date it was earned; (3) penalty wages of $64,336, plus interest from date of judicial demand; and (4) an attorney fee of $16,084, plus interest from date of judicial demand.
By final judgment, April 2016, the court incorporated the prior judgment and awarded ULCC 62½% of the commission received by Ms. Gosslee on Pine Road, or $43,500, with interest from date of judgment.
ULCC appealed, raising five assignments of error. Ms. Gosslee answered the appeal, raising seven.
DISCUSSION
Procuring Cause-Lamy Lane and Pines Road
By its first assignment of error, ULCC urges that it was the procuring cause of the Lamy Lane deal, and should get a share ($52,500) of Ms. Gosslee's commission; by her second assignment, Ms. Gosslee responds that the court correctly analyzed Lamy Lane. By her first assignment, Ms. Gosslee urges the court erred in awarding ULCC a portion ($43,500) of her commission on Pines Road; by reply brief, ULCC submits the court correctly analyzed Pines Road. Both sides concede the issue is factual and governed by manifest error.
Because ULCC had no contract with the buyer or the seller, the issue in these sales is "procuring cause."[2] A *790 realtor is entitled to a commission when he is a third-party beneficiary to a valid contract between a seller and a buyer. Creely v. Leisure Living Inc. , 437 So.2d 816 (La. 1983). A realtor can win a commission dispute if he is the procuring cause of the sale, or if the principal would otherwise enjoy an unjust enrichment at the broker's expense. Id. The concept is applied even where the term of the broker's listing agreement has expired. TEC Realtors Inc. v. D & L Fairway Prop. Mgmt. LLC , 2009-2145 (La. App. 1 Cir. 7/9/10), 42 So.3d 1116, writ denied , 2010-1841 (La. 10/29/10), 48 So. 3d 1092. Procuring cause is defined as follows:
A cause originating or setting in motion a series of events which, without break in their continuity, result in the accomplishment of the prime object of the employment of the broker, which may variously be a sale or exchange of the principal's property, an ultimate agreement between the principal and a prospective contracting party, or the procurement of a purchaser who is ready, willing and able to buy on the principal's terms. Sleet v. Harding , 383 So.2d 122 at 124 (La. App. 3 Cir. 1980) ; Cramer v. Guercio , 331 So.2d 550 at 552 (La. App. 1 Cir. 1976) ; Sleet v. Williams , 291 So.2d 495 at 498 (La. App. 3 Cir. 1974).
Creely v. Leisure Living , supra ; TEC Realtors v. D & L Fairway , supra .
The courts look to various factors to determine whether a broker has or has not been the procuring cause of a sale: whether the prospect who ultimately purchased the property knew about the property before being contacted by the broker; the relative success or failure of the negotiations conducted by the broker, including the continuity or discontinuity of the original and final negotiations, the length of time elapsing between the broker's negotiations and the final sales agreement; and the development of a new, different, or independent motive for the prospect to purchase; whether or not the broker abandoned efforts to negotiate the transaction with a particular prospect; and, finally, the good or bad faith of the principal and the broker. Farnsworth Samuel Ltd. v. Grant , 470 So.2d 253 (La. App. 4 Cir. 1985), citing Lora C. Sykora, "The Law of Real Estate Brokerage Contracts: The Broker's Commission," 41 La. L. Rev. 857 (1981).
We have closely examined the record evidence and find no manifest error in the district court's ruling as to Lamy Lane. ULCC correctly shows that it paid her monthly salary while Ms. Gosslee identified the intersection of Lamy Lane and Louisville Ave. as a potential Walgreens location, it paid a landman to find the owners, and Ms. Gosslee negotiated with them to buy the southwest corner. However, one of the owners was unwilling to break a sublease on the property, and negotiations ended sometime in 2000. Ms. Gosslee then identified the northeast corner as a potential location in February 2002, some seven months after she left ULCC. At this time, she found the owners, engaged them in fairly long negotiations, and closed a sale in May 2004. There is not one scintilla of evidence that after Ms. Gosslee left, in July 2001, ULCC performed any services to facilitate an agreement between the sellers and the buyer, Bradshaw. ULCC's first assignment of error lacks merit.
We have also examined the evidence as to Pines Road. The district court found "no break in the continuity" because the tract ultimately purchased by Walgreens was the same as that scouted by *791 Ms. Gosslee while she was employed at ULCC, and because the parties were the same. While these points are valid, they do not reflect the entirety of the transaction as properly analyzed under Creely v. Leisure Living and Farnsworth Samuel v. Grant , supra . The record shows that Bradshaw had a wish list of properties, including Pines Road, and considered this a "priority site" before he ever contacted ULCC. The initial negotiations for this tract had completely failed; the owner, Hutchinson, testified that as of the spring of 2001, the deal with ULCC was "dead," and they were even trying to revive their Goodyear store; the buyer, Bradshaw, also considered his exclusive representation agreement with ULCC "dead," and after signing with KGA he restructured the deal enough to induce Hutchinson's partner to sell; and at the time Ms. Gosslee left ULCC, neither side listed Pines Road as a "pending project." Most strikingly, during the 11 months from when ULCC's negotiations broke down until Ms. Gosslee obtained the purchase agreement, ULCC took no actions whatsoever to accomplish this sale. Bradshaw was adamant that after July 2001, he never heard from Coleman or anybody else at ULCC, and Coleman was "not sure" if he even called Bradshaw. This is, in our view, conclusive evidence that ULCC abandoned efforts to negotiate the transaction. In addition, Hutchinson testified that in late 2001 a lienholder on the property had become very ill, and was more inclined to release the property; and Ms. Gosslee testified that in early 2002 she saw a competing tire store had opened next to Hutchinson's tract; these facts show a "new, different or independent motive" for Bradshaw to purchase. Finally, the record simply does not support the implication that either Ms. Gosslee or Coleman acted in bad faith; they accomplished many of their objectives, and then parted ways.
Viewing the totality of the evidence, and applying the principles of Creely v. Leisure Living and Farnsworth Samuel v. Grant , supra , we are constrained to find the record does not support the finding that ULCC was a procuring cause with respect to the Pines Road deal. The district court's finding to the contrary is plainly wrong, and will be reversed. Ms. Gosslee's first assignment has merit.
Judicial Interest
By its fifth assignment of error, ULCC urges that any commission it is entitled to receive from Ms. Gosslee for the Pines Road deal should be subject to judicial interest from date of judicial demand, La. C.C. art. 2000. The final judgment imposed interest only "from the date of judgment."
Because we have determined that Ms. Gosslee was the procuring cause of the Pines Road deal, and ULCC is entitled to no portion of that commission, this assignment of error lacks merit.
Amount of Lease Commissions
By her fourth assignment of error, Ms. Gosslee urges the district court erred in awarding her only 31½%, instead of 47¼%, in lease commissions (a difference of $14,285.36). She argues her contract with ULCC was based on two documents. First, her employment agreement, December 1, 1995, stated that in the event of termination, an employee "shall be entitled to the leasing associate employee portion" for the current or primary term of the lease. Second, her commission schedule, October 3, 1997, set her rate at 47¼% for managed properties ("If listed and leased by" ULCC) and 31½% for nonmanaged properties (but 47¼% "When listed and leased by" Ms. Gosslee). She concedes that ULCC introduced two additional documents that had been placed in her personnel file, including a January 1, 1995, memo referring to the "lease management portion"
*792 and "leasing associate portion" of lease commissions, and an August 9, 1995, memo stating that "on termination, leasing schedule for nonmanagement accounts shall be used." She contends, however, that she never signed either of these memos, so she is not bound by them; they both predate her employment agreement, and are superseded by it; and they do not define or quantify the "lease management portion" which the district court apparently accepted as the difference between the 31½% and 47¼% commission rates. She concludes the court was plainly wrong to accept the antecedent, unsigned memos to vary the terms of her employment agreement and commission schedule.
ULCC cites Coleman's expansive testimony that the higher rate for managed properties reflected services and contacts with the lessee that the agent was intended to perform during the life of the lease; if the agent left, she would no longer perform these and thus was not entitled to the higher commission. It suggests the court committed no manifest error.
The interpretation of contracts is the determination of the common intent of the parties. La. C.C. art. 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. La. C.C. art. 2053. Parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless the written expression of the common intent of the parties is ambiguous. Campbell v. Melton , 2001-2578 (La. 5/14/02), 817 So.2d 69 ; Kennedy v. Saheid , 51,044 (La. App. 2 Cir. 11/16/16), 209 So.3d 985, writ denied , 2016-2241 (La. 1/23/17), 215 So. 3d 681. A contract is deemed ambiguous on the issue of intent when either it lacks a provision bearing on that issue, the terms of the contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language used. La. C.C. art. 1848 ; Campbell v. Melton , supra ; Kennedy v. Saheid , supra . Factual findings that pertain to the interpretation of a contract will not be disturbed absent manifest error. Campbell v. Melton , supra ; Kennedy v. Saheid , supra .
Even a cursory review of this record shows that the parties had a long, complex and evolving relationship. More than one document formed the entire agreement, and they are not wholly congruent. The employment agreement, December 1, 1995, established Ms. Gosslee's right to receive commissions post-employment; however, it specifically referred to the "leasing associate employee portion" and did not define this. Compounding the ambiguity, the commission schedule, October 3, 1997, distinguished between nonmanaged properties (15¾% to the listing employee, 31½% to the leasing employee) and managed properties (47¼% to the leasing employee). Coleman testified that ULCC paid the higher rate for managed properties because the agent was supposed to give customer service over the life of the lease; if the agent was no longer employed at ULCC, she could not provide these services. The August 1995 memo, setting post-termination commissions at the nonmanaged property rate, corroborates Coleman's explanation and is generally consistent with the terminology used *793 in the employment agreement.[3] On this record, we cannot say the district court committed manifest error in interpreting "leasing associate employee portion" as the nonmanaged property rate. This assignment lacks merit.
Validity of Lease Commissions
By its fourth assignment of error, ULCC urges the district court erred in awarding any unpaid commissions at all, because Ms. Gosslee did not specially plead quantum meruit. It contends that these commissions (totaling $27,875.37) arose post-employment and not pursuant to any agreement. It submits that her only viable theory of recovery is quantum meruit, La. C.C. arts. 2292 - 2294, a form of damages that requires special pleading, Terral v. Bearden , 338 So.2d 141 (La. App. 2 Cir. 1976). Without the special plea, ULCC concludes, the award is invalid.
By her third assignment, Ms. Gosslee urges that ULCC's own conduct, calculating and withholding her lease commissions after she left, proved the validity of her claim.
This court has already found that multiple documents constituted the entire agreement between ULCC and Ms. Gosslee; the employment agreement provided for payment of the "leasing associate employee portion" of a commission after termination, and the August 1995 memo provided for payment of "nonmanagement accounts" upon termination. The whole agreement clearly required the payment of earned commissions after Ms. Gosslee left the company. ULCC's contention to the contrary, and this assignment of error, lack merit.
Lease Commissions as Wages
By its second assignment of error, ULCC urges the district court erred in awarding penalty wages ($64,336.50) and an attorney fee ($16,084.13) under La. R.S. 23:632. The substantive statute, R.S. 23:631 A(1)(a), requires the employer upon discharge to "pay the amount then due under the terms of employment," but ULCC cites Coleman's testimony that commissions are not earned until the rent is actually collected each month as supporting the court's finding (September 2015 opinion) that ULCC had the discretion to declare when a commission was earned. ULCC also argues that post-termination commissions are not considered wages for purposes of the statute; in support, it cites Saacks v. Mohawk Carpet Corp. , 2003-0386 (La. App. 4 Cir. 8/20/03), 855 So.2d 359, writ denied , 2003-2632 (La. 12/12/03), 860 So. 2d 1158, and Boudreaux v. Hamilton Med. Group , 94-0879 (La. 10/17/94), 644 So.2d 619.
By her fifth assignment of error, Ms. Gosslee urges the court correctly awarded the penalty and attorney fee. She argues her employment agreement expressly distinguished between when a commission is earned (when the lease is signed) and when it is distributed (as each month's rent is received), and that courts have recognized the difference, as in Patterson v. Alexander & Hamilton Inc. , 2002-1230 (La. App. 1 Cir. 4/2/03), 844 So.2d 412, and Graves v. Automated Comm'l Fueling Corp. , 2005-2561 (La. App. 1 Cir. 11/3/06), 950 So.2d 759. She also argues that an employer may not invoke an internal pay policy as a pretext for an equitable defense, *794 Hendrix v. Delta Air Lines Inc. , 234 So.2d 93, 19 Wage & Hour Cas. (BNA) 502 (La. App. 4 Cir.), writ ref'd , 256 La. 364, 236 So.2d 498 (1970) ; Becht v. Morgan Bldg. & Spas Inc. , 2002-2047 (La. 4/23/03), 843 So.2d 1109, cert. denied , 540 U.S. 878, 124 S.Ct. 289, 157 L.Ed.2d 142 (2003).
Upon discharge of any laborer or other employee of any kind whatever, the employer is required to pay "the amount then due under the terms of employment," no later than 15 days after discharge. La. R.S. 23:631 A(1). Failure to comply with this provision subjects the employer to a penalty wage of 90 days' wages or full wages from date of demand until payment, whichever is less. La. R.S. 23:632 A. However, if the court finds that the employer disputed the amount of wages in good faith, the employer is liable only for the amount of wages in dispute plus judicial interest from date of judicial demand. La. R.S. 23:632 B. Reasonable attorney fees are to be awarded for any well-founded suit for unpaid wages filed by the employee after three days from first demand for payment. La. R.S. 23:632 C. The main purpose of these provisions is to compel an employer to pay the earned wages of an employee promptly after his dismissal or resignation; the employer cannot rely on unlawful company policy as a good-faith defense to § 632. Beard v. Summit Inst. of Pulmonary Med. , 97-1784 (La. 3/4/98), 707 So.2d 1233 ; Smith v. Acadiana Mortg. of La. Inc. , 42,795 (La. App. 2 Cir. 1/30/08), 975 So.2d 143. This statute is penal in nature and must be strictly construed, yielding to equitable defenses. Knight v. Tucker , 50,993 (La. App. 2 Cir. 11/16/16), 210 So.3d 407, 27 Wage & Hour Cas. 2d (BNA) 194, writs denied , 2017-0241, -0247 (La. 4/7/17), 218 So. 3d 109.
Generally, when sale commissions are at issue, the inquiry of whether a wage was actually earned focuses on what work associated with the sale remained at the time of the employee's discharge. Schuyten v. Superior Sys. Inc. , 2005-2358 (La. App. 1 Cir. 12/28/06), 952 So.2d 98, and citations therein . Where only collection of the fee is outstanding and collection is beyond the control of the employee, the employee has earned his commission for purposes of the Payment of Employees law; however, if a substantial amount of time and effort are needed to complete a sale, then the right to a commission may not have been earned. Id.
We recognize the apparent inconsistency between the two opinions rendered by the district court. In the September 2015 opinion, the court read the employment agreement as giving ULCC sole discretion to determine when commissions are earned. Since this meant that lease commissions were not earned until the lessee paid rent each month, Ms. Gosslee's commissions were not due on the day she resigned. However, in the February 2016 opinion regarding statutory penalties and attorney fees, the court found that ULCC "clearly erred in failing to timely pay Ms. Gosslee her earned commissions after her resignation in July of 2001." Using ULCC's internal records, the court calculated Ms. Gosslee's daily wage for 2001 at $714.84, multiplied it by 90 to get $64,336.50, and rendered judgment for that amount. Whatever the court may have stated in its first opinion, this was superseded by the second opinion and the judgment. The appeal is from the judgment, not from the written reasons for judgment. Greater New Orleans Expressway Com'n v. Olivier , 2002-2795 (La. 11/18/03), 860 So.2d 22 ; Hardy v. Easterling , 47,950 (La. App. 2 Cir. 4/10/13), 113 So.3d 1178. We therefore do not accept the claim that the district court found the lease commissions were not wages for purposes of R.S. 23:632.
Instead, we have reviewed, under the manifest error standard, the court's implicit *795 finding that the lease commissions were wages. The employment agreement states:
When the Associate-Employee shall perform any service hereunder, whereby a commission is earned, said commission shall, when collected, be divided between the Broker [ULCC] and Associate-Employee, pursuant to the rider attached[.]
The plain reading of this passage is that the commission is earned when the employee performs "any service hereunder," and that it is divided when it is collected. The commission was earned when Ms. Gosslee secured a tenant and got him to sign on the dotted line; it would not be distributed until the tenant paid each month's rent. This plain reading mirrors Ms. Gosslee's interpretation of the agreement and finds support in ULCC's careful accounting (and withholding) of her monthly commissions.
Moreover, it is analogous to the judicial approach to sale commissions in cases like Patterson v. Alexander & Hamilton , supra , and Graves v. Automated Comm'l Fueling Corp. , supra . The general rule is that when only the collection of the fee is outstanding, and collection is beyond the control of the employee, the employee has earned his commission. The cases cited by ULCC do not contradict this rule: Boudreaux v. Hamilton Med. Group , supra , involved not sale commissions but a contractual severance package, which the Supreme Court found did not constitute payment for employment "by the day, week or month"; and Saacks v. Mohawk Carpet , supra , found that the plaintiff never converted her pay scheme from salary to commission, and the court actually affirmed the imposition of penalty wages.
The district court did not abuse its discretion in finding that Ms. Gosslee's lease commissions were amounts then due under the terms of employment, as required by R.S. 23:631 A(1)(a), in treating them as wages, and in imposing penalty wages under R.S. 23:632 A. ULCC's second assignment of error lacks merit.
By its third assignment of error, ULCC urges, in the alternative, that even if the penalty and attorney fee are warranted, they should apply only to commissions that were unpaid (some $7,114.23) before the Pines Road deal closed, November 2002. Under R.S. 23:632 B, the penalty does not apply if the "employer's dispute over the amount of wages due was in good faith," or if the employer has an equitable defense. Rodriguez v. Green , 2012-0098 (La. App. 4 Cir. 6/20/12), 111 So.3d 1. ULCC contends that after Ms. Gosslee closed the Pines Road deal without remitting any commission-and the court found that commission was due-it (ULCC) was entitled to offset or "credit" her lease commissions against the debt.
Even though it found that ULCC was entitled to a share of Ms. Gosslee's sale commission on the Pines Road deal, the district court did not consider this a good-faith dispute or an equitable defense to payment of the lease commissions that Ms. Gosslee had already earned. This was no abuse of discretion, given that the lease commissions were earned and quantified while the sale commission was subject to valid legal dispute. In light of this court's finding that ULCC is not entitled to a share of the Pines Road commission, there is even less to ULCC's claim of good faith and equitable defense. Blanton v. Malkem Int'l Corp. , 628 So.2d 178 (La. App. 2 Cir. 1993). As noted, the purpose of § 632 is to compel the prompt payment of wages after an employee's dismissal or resignation. Beard v. Summit Inst. , supra ; Smith v. Acadiana Mortg. , supra . Significantly, Ms. Gosslee did not initiate litigation to recover her lease commissions; she asserted it only after ULCC sued her for sale commissions.
*796 We perceive no abuse of discretion. ULCC's third assignment lacks merit.
Quantum of Attorney Fee
By her sixth assignment, Ms. Gosslee urges that while attorney fees were plainly warranted under R.S. 23:632, the amount awarded ($16,084.14) is "grossly inadequate," considering that her unpaid commissions and penalty wages totaled $120,088.23 plus judicial interest. She submits that 35% would be reasonable, as was awarded in Saacks v. Mohawk Carpet Corp. , supra . She suggests raising the award to $42,030.88.
ULCC chiefly argues that no attorney fee was due because post-termination lease commissions were not earned until each month's rent was collected, and they were offset by the sale commission on Pines Road; for the reasons already discussed, these arguments lack merit. In the alternative, ULCC submits the award was not an abuse of discretion.
An award of attorney fees must be reasonable, based on the degree of skill and work involved in the case, the number of court appearances, the depositions and the office work involved. Smith v. Acadiana Mortg. , supra , and citations therein . The factors bearing on the reasonableness of an attorney fee are (1) the ultimate result obtained, (2) the responsibility incurred, (3) the importance of the litigation, (4) the amount of money involved, (5) the extent and character of the work performed, (6) the legal knowledge, attainment and skill of the attorneys, (7) the number of appearances involved, (8) the intricacies of the facts involved, (9) the diligence and skill of counsel, and (10) the court's own knowledge. State v. Williamson , 597 So.2d 439 (La. 1992) ; Rule 1.5, Rules of Prof. Conduct. The trial court is vested with considerable discretion in setting attorney fees and its decision will not be disturbed absent an abuse of that discretion. Smith v. Acadiana Mortg. , supra ; Hanks v. Louisiana Cos. , 2016-334 (La. App. 3 Cir. 12/14/16), 205 So.3d 1048, 2016 IER Cases 414,549.
The district court used the penalty wages, $64,336.50, and awarded 25% of this amount as attorney fee, $16,084.13. At first blush, this appears low, for a case that was pending nearly 13 years, entailed four days of trial over nearly three years, generated nearly 15 lbs. of trial exhibits, and required additional court-ordered briefs. Still, we find that much of this monumental effort was devoted to litigating the sale commissions for Pines Road and Lamy Lane, items that were contractual in nature and not "then due" at the time of Ms. Gosslee's separation from ULCC. On this record, we do not consider 25% an abuse of discretion. Further, cases like Saacks v. Mohawk Carpet , supra , and Waller v. State , 2011-643 (La. App. 3 Cir. 11/9/11), 79 So.3d 1085, writ denied , 2011-2692 (La. 2/10/12), 80 So. 3d 488, 80 So. 3d 488, affirmed 35% attorney fees on the records presented; we do not read them as setting a standard. This assignment of error lacks merit.
By her seventh assignment of error, Ms. Gosslee urges she is entitled to additional attorney fees for responding to the appeal, as authorized by R.S. 23:632. Webb v. Roofing Analytics LLC , 48,248 (La. App. 2 Cir. 7/24/13), 121 So.3d 756. She requests an additional $18,750 for the appeal.
An additional attorney fee is usually awarded when one party appeals, obtains no relief, and the appeal has necessitated additional work on the part of the other party's counsel. Graves v. Automated Comm'l Fueling, supra . The amount of the additional fee is within the appellate court's discretion. Webb v. Roofing Analytics LLC , supra . On this record, an additional *797 attorney fee of $5,000 is appropriate. This assignment of error has merit; the judgment will be amended accordingly.
CONCLUSION
For the reasons expressed, the district court's judgment of February 24, 2016, is affirmed in its entirety. However, the district court's "final judgment," of April 15, 2016, is reversed insofar as it awarded ULCC any portion of the sale commission of Pines Road. Finally, this court renders judgment in favor of the defendant, Keitha Dickson Gosslee, and against the plaintiff, U.L. Coleman Co. Ltd., for attorney fees in the amount of $5,000.00, for handling this appeal.
Each side is to bear its own appellate costs.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED .
BROWN, C.J., dissents in part with written reasons.
BLEICH, (Pro Tempore ), J., concurs in part and dissents in part with written reasons.
BROWN, C.J., dissents in part with written reasons.
I fully agree with Judge Bleich's reasons in his dissent. I would, however, additionally dissent from the award of penalties and attorney fees in relation to lease commissions. This litigation was not initiated by Gosslee. As the majority opinion clearly shows, the many issues in this case were complex and were competently argued. As to the lease commissions, there were questions as to whether they were wages and when they were earned. Further, there were two contradictory opinions by the trial court as to whether these lease commissions were wages for purposes of La. R.S. 23:632. The defenses to the lease commissions were not in bad faith and were equitable.
BLEICH, J. (Pro Tempore ), concurring in part and dissenting in part.
The trial court's factual finding concerning the Pines Road/70th Street transaction was not manifestly erroneous. In fact, Judge Pitman's conclusion was clearly correct. He adroitly distinguished between the unsuccessful original negotiations and consummation of the ultimate transaction. In this writer's opinion the only "break in continuity" in this transaction was that manufactured or imagined by Gosslee. For these reasons, this dissent is submitted. In all other particulars, I concur in the excellent majority opinion.
In his opinion, Judge Pitman found:
To be the procuring cause, the company must set into motion a series of events without a break in their continuity. Here, there was no break in the chain of events that led to the purchase of the property. There was no break in the continuity of the sale because (1) the property finally purchased by Walgreens was the exact property that was scouted by Ms. Gosslee during her employment with ULCC, and (2) the parties involved in the second negotiation were the same ones involved in the original negotiation. It is possible that, had the property been sold to a different party in the interim, and was then sold Walgreens, this may have been sufficient to constitute a break in continuity. However, this was not the case.
Judge Pitman's review of the evidence and logical conclusions drawn from it were most efficient and compelling in light of the conflicting testimony offered by the parties. The trial court exercised sound judgment in determining the truth. In addition to that which appears of record, we should grant deference to the trial judge's *798 decision because of his ability to observe the demeanor of various witnesses over the course of several days. In particular, he had the opportunity to judge the credibility of Gosslee and Coleman.
Portions of the trial testimony are corroborative of the trial judge's decision and what was ultimately believed. Multiple instances, gleaned strictly from the trial transcript, show Gosslee as argumentative, sarcastic, non: responsive, focused on a result, misleading, and overly dramatic. Certainly, the tenor of the testimony might very well have been a legitimate basis for the trial judge's conclusions.
Otherwise, the majority's emphasis on Creely v. Leisure Living Inc. , 437 So.2d 816 (La. 1983) is not pertinent here. The rule of law is correctly stated, although it is noted that the "factors" of procuring cause mentioned there are not exclusive but illustrative. Moreover, the factual context of that decision is different from the present case. The majority and trial court certainly recognized the applicable considerations concerning "procuring cause." In our case, however, there is a dispute between two realtors, one of whom, Gosslee, was an employee and agent of the other, ULCC. In this context, Gosslee had dual duties to both her client and employer. The involvement of ULCC in setting in motion a series of events and circumstances, including training Gosslee, coupled with the balance of the trial court's findings, all of which led to the ultimate sale, are significantly different from the facts of Creeley , supra (involving splitting a proposed commission, in a concursus proceeding, between a builder: seller and real estate agent).
In this case, one of the "links" in the "chain of events" was the training, experience and expertise provided by ULCC to Gosslee which benefitted her as ULCC's agent serving the needs of the client. Such training and opportunity created a situation in which the client, acting through Bradshaw, fully believed at pertinent times during the representation that Gosslee and ULCC were one and the same. In large part, but for the training and opportunity provided by ULCC, Gosslee would not have been able to "sign an exclusive contract" with Bradshaw, which was "coincidentally" prepared as soon as possible after her leaving ULCC.
Indeed, in our case, Bradshaw (acting on behalf of Walgreens) entered the original contract with ULCC, not Gosslee. Gosslee acknowledged that Bradshaw originally contacted ULCC seeking a CCIM designee, which Gosslee did not possess at that time. Gosslee also admitted that, during her employment with ULCC, the Pines Road/70th Street project was "active" and "was always a priority site." Even after the original written exclusive contract between Bradshaw and ULCC expired on its face, Bradshaw and ULCC were doing business and communicating with one another, a fact Gosslee conceded. Gosslee also admitted that she would not have had contact with Bradshaw but for Coleman. Furthermore, after hurriedly confecting her own agreement of exclusivity with Bradshaw, Gosslee admitted she was unsure if the former exclusive agreement with ULCC and Bradshaw could be continued via an "oral" basis. From these facts, one could easily infer that during the time Gosslee worked as an agent for ULCC, she did in fact develop a professional relationship with Bradshaw, but still owed a duty of fidelity to ULCC.
Further support for the trial court's conclusion was the testimony of Hutchison, one of the property owners, who suggested to Gosslee that she "might want to take another run at" the recalcitrant third party. This most significant development occurred when Hutchison thought he was *799 dealing with ULCC. Hutchison was unaware of any purported "break in continuity," and stated:
I really didn't even realize she was off on her own at that time , you might want to take another run at Mr. Moore because he's been very ill, and may be receptive to selling the business, so ...
(Emphasis supplied).
Hutchison further stated:
Q: So what that means is the deal didn't change from April, 2001 until you consummated the deal in 2002, correct?
A: It didn't appear to.
Q: Same property , right?
A: Yes.
Q: Same owners ?
A: Yes.
Q: Same purpose of the property?
A: Yes.
Q: Same use to be utilized by the purchaser?
A: Yes.
Q: And it was only because Mr. Moore was reluctant or recalcitrant that you didn't make the deal?
A: Yes, sir.
Q: So nothing changed about the deal except Mr. Moore's health and ideas about his property?
A: Yes.
(Emphasis supplied).
The trial court also rejected the self: serving testimony of Gosslee that the "deal was dead," and in its opinion stated:
In this case, this court does not find the declaration of the original negotiations as dead sufficient to warrant a break in continuity. As previously mentioned, every other condition-the property, and the parties-remain the same.
The totality of the record in this case certainly indicates that one detail of the ultimate transaction had not yet come into existence, i.e., the innovative financing suggested, not by Gosslee, but by Bradshaw. As dramatically as Gosslee urged that the "deal was dead," it obviously was not.
There was a plethora of testimony presented to the trial judge in which Coleman indicated his bona fide belief that ULCC was still representing Bradshaw. Coleman testified he had never heard of anyone else representing him until late. Coleman stated he had a valid oral agreement with Bradshaw, which was a continuation of the written exclusive representation and that Gosslee was going forward performing services for Bradshaw in connection with an existent relationship with ULCC. In Coleman's view, ULCC never "abandoned the Bradshaw project" and thus the representation was not "dead." Gosslee never told ULCC the "deal was dead."
Obviously, there is a distinct difference in opinion between Coleman and Gosslee regarding whether the Pines Road/70th Street transaction was "dead." The trial judge was required to make a finding of fact. He did. The conclusion of the trial judge in this regard was certainly justified based on the evidence. It is inappropriate for the appellate court to second guess the trial judge's credibility determination absent a finding of manifest error.
It also cannot be accurately concluded that the sudden exit of Gosslee, vis-à-vis the Pines Road/70th Street transaction, and her quickly arranged exclusive agreement with Bradshaw did not include surreptitious behavior by Gosslee. No "coincidence" occurred in Bradshaw's being signed by Gosslee to an exclusive agreement at the expiration of 30 days and Gosslee's inability, due to the status of her license, to create and execute her "exclusive" agreement until that very day. Gosslee informed only Bradshaw that her departure from ULCC, "was a possibility,"
*800 prior to notifying ULCC that she was planning to leave. Gosslee even overheard a conversation between Bradshaw and Coleman in which they discussed Coleman continuing to represent him.
Furthermore, these independent "occurrences" accurately present an additional basis to support the trial judge's rejection of Gosslee's testimony as to the "break in continuity." Upon Gosslee's physical departure, ULCC requested she return all files taken from ULCC without authorization. There were multiple references to this intentional behavior of Gosslee. Yet Gosslee, as talented and bright as she seems stated the following:
Q. Ms. Gosslee, as far as taking files, you just said that you did take the file on the Pines and 70th transaction when you resigned from ULCC; is that correct?
A. Accidentally, along with some other accidental ones .
(Emphasis supplied).
Gosslee's claim that the Pines Road/70th Street transaction file was taken "accidentally" allows the inference to be drawn that she did not have any right, at all, to take that file. Certainly, as an apparent defense against allegations of improper activity on her part, Gosslee's "explanation" was at best disingenuous. These activities and explanations by Gosslee present significant support for the trial judge's rejection of Gosslee's position that there had been a break in continuity.
Ultimately, upon review of the entirety of the testimony, it can be easily concluded that Gosslee was actually not the moving cause of the ultimate sale. These three factors are relevant to this conclusion: (1) Bradshaw established an ongoing relationship with ULCC, with whom Gosslee was employed; (2) Hutchison, a property owner, made it known that the sale, after initial negotiations had not proven productive, might still be viable; and, (3) Bradshaw, who had an ongoing relationship with ULCC, developed an innovative form of financing the transaction. Certainly, Gosslee was a conduit of information, but her primary claim to a fee from the Pines Road/70th Street transaction was a concocted "new arrangement" with Bradshaw which she concealed from ULCC.
Having concurred in most of the majority opinion, the conclusion of the majority ordering a reversal of the trial judge's ruling as to the Pines Road/70th Street transaction is erroneous. Therefore, I respectfully dissent and would affirm that portion of the trial court's judgment.

They did not testify as to who got the remaining 5%.

By her second assignment of error, Ms. Gosslee also argues that the notion of procuring cause is intended to apply between an agent and a client (buyer or seller), and not between two agents, a distinction this court recognized in Price Farms Inc. v. McCurdy , 45,409 (La. App. 2 Cir. 7/7/10), 42 So.3d 1099 (we stated that as between a seller's agent and a buyer's agent, a claim based on procuring cause was "more tenuous"). We still acknowledge this conceptual distinction, but, on the instant record, we decline to jettison the analytic framework of procuring cause that guided the parties' presentation of evidence and informed the district court's factfinding. We therefore pretermit any consideration of this portion of Ms. Gosslee's second assignment.

Ms. Gosslee shows that the 1995 memos were never signed by her; however, the copy of her 1997 commission schedule, filed in evidence as Exhibit D: 31, also appears not to be signed by her. Ms. Gosslee has not contended that the commission schedule is invalid for this deficiency.